Frank Guerrini Vending Machines, Inc. v. Commissioner.
Frank Guerrini Vending Machines, Inc. v. Commissioner
Docket Nos. 264-68, 265-68.
United States Tax Court
T.C. Memo 1969-272; 1969 Tax Ct. Memo LEXIS 23; 28 T.C.M. (CCH) 1369; T.C.M. (RIA) 69272; December 15, 1969, Filed *23 James M. Carter, 1315 Walnut St., Philadelphia, Pa., for the petitioners. Stephen P. Cadden, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income tax as follows: [1]
Petitioner
Year ended
Deficiency
Frank Guerrini Vend- ing Machines, Inc. Docket No. 264-68
Nov. 30, 1959
$22,770.30
Nov. 30, 1960
31,915.04
Nov. 30, 1961
1,660.93
Frank and Marie Guerrini Docket No. 265-68
Dec. 31, 1959
26,913.56
Dec. 31, 1960
36,970.36
Dec. 31, 1961
3,489.19
The cases have been consolidated for trial. After concessions by both parties, the only issues presented for decision are as follows: (1) whether Frank Guerrini Vending Machines, Inc. ("the Corporation") is entitled to a theft loss deduction of $90,045.15 for the fiscal year ended November 30, 1961; (2) whether Frank and Marie Guerrini received dividend income from the Corporation during the calendar years 1959, 1960 *24 and 1961 in the amounts of $49,920.31, $61,608.79, and $4,872.10, respectively; (3) whether the statute of limitations bars assessment of a deficiency with respect to Frank and Marie Guerrini for the calendar year 1959; (4) whether the Corporation is entitled to deduct from its gross income $5,000 allegedly paid to two employees to promote the Corporation's business during the fiscal year ended November 30, 1959; and (5) whether Frank and Marie Guerrini are entitled to a bad debt deduction of $3,737.24 for the calendar year 1960. Findings of Fact The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference. Frank Guerrini Vending Machines, Inc. is a Pennsylvania corporation with its principal place of business in Lewistown, Pennsylvania. It maintained its books and records on an accrual basis of accounting and filed its Federal corporate income tax returns for the fiscal years ending November 30, 1959, 1960 and 1961 with the district director of internal revenue, Philadelphia, Pennsylvania. Frank and Marie Guerrini are husband and wife. They were legal residents of Lewistown, Pennsylvania, at the time the petition *25 was filed in this case. The Guerrinis rinis filed joint Federal income tax returns for the calendar years 1959, 1960 and 1961 with the district director of internal revenue, Philadelphia, Pennsylvania. Frank Guerrini (sometimes hereinafter referred to as "Frank" or "Guerrini") was born in Rome, Italy, in 1912 and entered the United States in 1921. With the exception of a "Dale Carnegie" course in public speaking, his formal education did not progress beyond the eighth grade. In 1946 Guerrini became engaged in the vending machine business. Initially he was involved only with coin-operated phonographs or "juke boxes." In 1957 he organized Frank Guerrini Vending Machines, Inc. Its directors, officers, and stockholders during the years in question were as follows: Office
No. of Shares Held
Frank Guerrini
President
480
Marie Guerrini
Vice. Pres. & Secretary
2
Frank L. Guerrini, Jr.
Treasurer
2 Frank L. Guerrini, Jr., is Frank's son by a previous marriage. During the years in question Guerrini's corporation was engaged in the business of placing and leasing coin-operated machines in clubs, meeting halls, restaurants, bars, gas stations, and fire houses in and around Lewistown, Pennsylvania. During *26 this period 1371 the Corporation had over 200 cigarette machines, 110 juke boxes, about 60 or 70 pinball machines, and a limited assortment of coin-operated amusement devices placed in establishments in the vicinity of Lewistown. In addition, at least until April 1961, the Corporation had also located between 70 and 80 slot machines in various establishments. Most of the Corporation's inventory consisted of ordinary coin-operated machines. However, some of its slot machines and possibly some of its pinball machines were activated by an electronic remote-control device. These "remote" or "free-play" machines would not accept money and could be activated only by the management of the establishment where the machine was located. Customers wishing to play a "remote" paid their money directly to an employee of the establishment, who would then activate the machine to permit the appropriate number of plays. The Corporation's office and shop were located in the same building at 1211 West Fourth Street in Lewistown. The Corporation's only other business property was a two-car garage in which it stored its unused machines. Three employees worked in the office during the years in question: Gilbert *27 Bradey Ulsh ("Ulsh"), Audrey Eisenhardt ("Eisenhardt"), and Marie Guerrini ("Marie"). Only Ulsh, the office manager and bookkeeper, was a full-time employee. Ulsh and Frank Guerrini were long-time business associates. Ulsh began working for Guerrini in 1946 or 1947, about the time that Guerrini entered the vending machine business, and Ulsh became an employee of Guerrini's corporation when it was organized in 1957. In performing his duties as bookkeeper Ulsh followed a system which had been set up for the Corporation by its accountant, Walter Power. However, Ulsh's day-to-day activities were generally conducted without supervision. Eisenhardt worked in the office on a parttime basis from 1958 until the latter part of 1961. With the exception of a week or two in 1961, she worked only during the morning. Her duties supplemented those of Ulsh and are described below in greater detail. Her prior employment experience included 2 1/2 years spent working for a bank. While there she had become adept at the use of an adding machine. Marie Guerrini did not begin to work in the office until late 1960. She worked on two days in December of that year and for several hours a day during the first *28 three months of 1961. She supervised the conduct of the business during that time but she did not supervise Ulsh. Five men worked in the Corporation's shop: Frank Guerrini, Patrick Guerrini (Frank's brother), Norman Oldt (Frank's brother-in-law), and two other men. In the shop they constructed cabinets and tables for the machines and converted coin-operated machines into "remotes". However, Frank Guerrini also spent a considerable amount of time away from the shop, repairing machines at their locations or performing other Corporation business. In addition to their duties in the shop, Patrick Guerrini and Norman Oldt served as "route men". Between 1959 and 1961 the Corporation employed about 10 such "route men". It was their job to make periodic visits to the locations where the Corporation had placed its machines. Each location was visited regularly, although some were visited more frequently than others, depending upon the amount of use they received. The route men refilled the vending machines when necessary and collected the money which had been deposited in them, as well as in other machines such as juke boxes or pinball machines. If the machine was a "remote", the route man collected *29 the proceeds from an employee at the location. Ordinarily, the route man relied on the employee's honesty to ensure that all of the proceeds from a "remote" were reported. In some cases, however, a meter was installed to indicate the amount of use the machine had received. The route men divided their collections with the proprietor of each location according to a prearranged formula. For instance, the proceeds from pinball machines were divided on a 50-50 basis. The proceeds from juke boxes were also ordinarily divided on a 50-50 basis, but if a juke box were located in a less profitable place, the proprietor received only 40 percent of the proceeds. At each location the route men divided the proceeds from the amusement machines according to the applicable formula and paid over the amount due to the location owner on the spot. The proceeds from cigarette machines were handled somewhat differently. Location owners received 20 cents per carton of cigarettes sold, and payment was made by check at the end of each month. 1372 In addition, the route men devoted some effort to "location solicitation". In an effort to maintain locations for the Corporation's machines, the route men occasionally *30 bought drinks for those present at the time they came to service the machines. The Corporation also furnished weekly prizes for high scores achieved on some of its pinball machines. The cost of the prizes, however, was apparently borne by the location owners. At each location the route man filled out a "daily collection slip." On it he listed the location, the type of machine serviced, and the amount withdrawn from the machine. With the exception of collections from cigarette machines, the route man then indicated the Corporation's share of the proceeds. From the Corporation's share he subtracted the cost of any drinks he had purchased and added on the cost of prizes which the Corporation had furnished. In addition, a Federal excise tax was imposed on certain gambling devices; and in some cases the Corporation had previously paid the tax on behalf of the location. In that event the route man added to the Corporation's share of the proceeds a percentage of the tax it had paid, thereby enabling the location owner to repay the Corporation on an installment basis. After the route man calculated the Corporation's share of the proceeds, the location manager signed the collection slip. The *31 location manager kept the original slip, and the route man retained a carbon copy. As soon as he left each location, the route man placed the money he had collected in a safe in the truck in which he was traveling. The money remained in the safe all day while the route man made his collections. At the end of the day the route men returned to the Corporation's office with the day's collections and carbon copies of the day's collection slips. Ordinarily they turned over the money and the slips directly to Ulsh. As each route man turned over the money, Ulsh totaled the accompanying slips on an adding machine and ran the coins through a counter to ensure that the proceeds were fully accounted for. He then placed the money and the collection slips in a safe in the office where they remained overnight. In accordance with the Corporation's system of record keeping, all the collections for a given day were recorded on a "Daily Analysis Sheet" prepared by Ulsh, and the total shown on that sheet was personally deposited by Ulsh the next morning in the Corporation's account at the First National Bank of Lewistown. The amount thus deposited was reflected in the Corporation's books in respect of *32 the day's collections, and was ultimately reflected in the Corporation's receipts shown on its income tax returns. However, there were substantial discrepancies between the amounts shown on the Daily Analysis Sheets and the amounts actually collected and turned over to Ulsh. Such discrepancies arose in part in the following manner: The receipts on the Daily Analysis Sheet were classified according to the type of machine (pinball, cigarette, juke box, etc.). Accordingly, Ulsh grouped the collection slips according to type of machine, and prepared an adding machine tape in respect of the day's receipts for each type. By manipulating the adding machine in a certain manner he was able to show a false total on the tape which was in fact less than the sum of the component figures appearing on the tape, and the corresponding entry on the Daily Analysis Sheet was based upon that false total. In addition to the foregoing discrepancies attributable to the falsified tapes, there were at times further discrepancies in the Daily Analysis Sheets, which contained false entries that were even lower than the false totals on the tapes. As a consequence of the false totals on the tapes and the false *33 entries in the Daily Analysis Sheets, the amounts actually deposited in the bank were less than the amounts turned in by the route men, and the resulting shortages were reflected in understatements of receipts in both the Corporation's books and its income tax returns. Eisenhardt worked in the office during the morning. Her only duty was to enter the amounts reported on the daily collection slips in a "location ledger". There was a page in the location ledger for each establishment using one of the Corporation's machines. Thus the ledger enabled the Corporation to keep track of the profitability of each of its locations. There were few variations from the foregoing office routine. Occasionally Ulsh was out of the office when a route man returned from his collection route, and Frank Guerrini received the money and the collection slips. On other occasions, the route man would finish his collections late in the day and wait until the next morning before 1373 submitting the money and the slips to the office. It also appears that from time to time Frank made the bank deposits. But generally, about 90 percent of the time, the office routine proceeded as described above. Ordinarily, only *34 Frank, Patrick Guerrini, and Ulsh had keys to the Corporation's office during the years in question. However, in early 1961 Frank was out of the office, while serving a three-month jail sentence which will be described below. During that period Marie had his office key. Furthermore, only Frank and Ulsh knew the combination to the office safe. It also appears that Ulsh ordinarily locked up both the safe and his desk whenever he left the office during the day. From time to time Frank Guerrini made collections from the Corporation's machines. However, he did not always return to the business office the collections from all of the machines from which he had withdrawn funds. Instead, he drew an "X" across the corresponding collection slips to indicate that although the amount reported thereon had been collected, the proceeds would not be submitted to the business office. The "X" slips were ordinarily submitted to the business office along with the ordinary daily collection slips. Ulsh did not include the amounts reported on the "X" slips when he made his calculation of the amount of cash which should have been turned in, nor did he include those amounts when he completed the "Daily Analysis *35 Sheet". Furthermore, when posting the "location ledger", Eisenhardt did not enter the amounts reflected in the "X" slips. The receipts reported on the "X" slips were never reported as income on the Corporation's Federal income tax returns. Some of the funds not turned into the business office and reflected on the "X" slips were spent as follows: From time to time during 1959 and 1960 the Corporation purchased slot machines owned by clubs in which the Corporation had already placed some of its own machines. Slot machines were outlawed in Pennsylvania. See 18 Pa. Stat. Ann. sec. 4605. As a result some clubs clubs were apparently anxious to sell their slot machines, but did not wish to be paid by check. When a club notified the Corporation that it desired to sell its slot machines, Frank Guerrini replaced the regular route man at the next collection at that club. When visiting the club Guerrini adopted the same procedure followed by the regular route man: He serviced the Corporation's machines and calculated the Corporation's share of the proceeds on a collection slip. Ordinarily, the purchase price of the slot machines was no greater than the Corporation's share of the proceeds from *36 the machines which Guerrini had serviced. Thus, in paying for the slot machines, he simply left with the club that portion of the Corporation's proceeds required to cover the cost of the slot machines. When purchasing slot machines in this manner, Guerrini drew an "X" across the collection slip which reported the funds out of which the purchase price had been paid. In rare cases, the purchase price of the slot machines exceeded the Corporation's share of the proceeds from its own machines. In that event, Guerrini used funds he had collected from the Corporation's machines at neighboring clubs to make up the difference. Accordingly, the appropriate collection slips were also marked with an "X". More frequently, the Corporation's share of the proceeds from its machines exceeded the cost of the slot machines which it was purchasing. When this occurred Guerrini nevertheless marked the collection slip with an "X" and did not submit any of the excess proceeds to the office. Part of the excess proceeds were given to Patrick Guerrini and Norman Oldt. Such payments were made to each of them weekly and varied in amount from $50 to $100 each. A portion of these payments were spent for "promotional *37 purposes." In an effort to secure and maintain favorable locations for the Corporation's machines, Patrick Guerrini and Oldt bought drinks for the owners and employees of desirable locations. Patrick Guerrini also retained part of these payments for his personal use. Initially he did not report the amounts he retained as income on his Federal income tax returns. After a dispute with the Internal Revenue Service, a stipulation was filed setting the tax on the unreported income for 1958 and 1959 at $454.50 and $558.54, respectively. The record does not reveal whether Norman Oldt also kept part of these payments. In contrast to the foregoing payments in cash, salary and bonus payments made by the Corporation to Patrick Guerrini and Oldt were paid by check. As a result of his involvement with slot machines, Guerrini encountered difficulties with either state or local law enforcement authorities during the years in issue. 1374 Although the record is unclear in this respect, it appears that he was convicted of a gambling offense on at least one occasion. In 1960, the Corporation paid a $4,000 fine on his behalf, and he served 90 days in the Clinton County Jail from December 28, 1960 until *38 late March 1961. In an apparent effort to avoid further trouble with the law, Guerrini destroyed all of the "remote" slot machines soon after his release from jail in 1961. While Guerrini was serving his 90-day sentence, Ulsh was put in charge of the general operation of the business. During January of 1961 Audrey Eisenhardt noticed changes in Ulsh's behavior: Ulsh started to drink more heavily and more frequently than was his wont; he often left the office for hours during the middle of the day; and, departing markedly from his customary behavior, he often failed to lock his desk drawers when he left the office. Already suspicious of what she viewed as a discrepancy between Ulsh's salary and his standard of living, Eisenhardt took the opportunity presented by Ulsh's absences to check certain adding machine tapes which she found in Ulsh's unlocked desk. Each tape purported to compute the sums of one day's receipts from a particular kind of machine (juke box, pinball, etc.) as reported on the daily collection slips. But after checking the addition on several tapes, Eisenhardt concluded that many of the tapes understated the sums of the amounts reported on the collection slips. Around *39 the end of January, Eisenhardt called Marie Guerrini to tell her of her discovery. Marie came to the office on the following day while Ulsh was out and saw what Eisenhardt had discovered. During February Marie and Eisenhardt pursued the investigation, largely during the evenings. Most of the tapes and collection slips for the previous two years had been stored by Frank Guerrini in the garage at his home. The tapes and slips for the last five or six months of 1960 were found in Ulsh's desk, but during February, they were removed. When asked where they were Ulsh told Marie that he had stored them at his home. Marie asked Ulsh to bring the tapes and slips back to the office, but Ulsh never did, explaining that he kept forgetting about them. Eventually Marie sent her step-son, Frank L. Guerrini, Jr., to Ulsh's home to retrieve the records. Ulsh readily turned the tapes and slips over to him. Subsequently, Marie and Eisenhardt discovered that most of the tapes and slips were there, but that some of the tapes for December 1960 were not. In any event, the investigation continued to reveal shortages on the adding machine tapes. On Febraury 27 and 28, 1961, Ulsh suffered a heart attack. He *40 never returned to work at the office thereafter. Ulsh died on December 5, 1962 in the Lewistown Hospital. After returning from jail in late March of 1961, Guerrini learned of the discrepancies which had been discovered and informed his attorney, Robert Brugler, that he suspected that Ulsh had embezzled funds from the Corporation. Brugler recommended that Guerrini secure the services of a firm of certified public accountants to evaluate the Corporation's records. Pursuant to this recommendation, the Corporation engaged the services of the firm of Laventhol, Krekstein, Horwath and Horwath. The firm performed two audits for the fiscal years ending November 30, 1959 and November 30, 1960 and for December 1, 1960 to February 28, 1961. The first audit was completed in the spring of 1962, and the second was performed subsequent to August 11, 1964, the date on which the Corporation received a "30-day letter" from the Internal Revenue Service. The audits disclosed two types of discrepancies in the Corporation's records "which were described above" for the fiscal years ending November 30, 1959, and November 30, 1960: (1) The adding machine tapes which were attached to the Corporation's collection *41 slips and which purported to add the amounts reported on the slips understated the sum of those amounts. (2) The figures on the Daily Analysis Sheets were not always as great as the sums computed on the adding machine tapes which the Corporation had submitted to the auditors. Since some of the machine tapes for the period from December 1, 1960 through February 28, 1961 were missing, the auditors could determine the size but not the source of the discrepancy for that period. The discrepancies determined by the auditors wer as follows: Fiscal year ended November 30, 1959:
(1) adding machine discrepancy
$15,085.22
(2) cash analysis sheet discrepancy 21,594.12
Total
$36,679.34
Fiscal year ended November 30, 1960:
(1) adding machine discrepancy
$40,596.50
(2) cash analysis sheet discrepancy 8,438.36
Total
$49,034.86
Fiscal year ended November 30, 1961:
Total
$ 4,357.95
The auditors also totaled the amounts reported on the "X" slips (and not reflected in the Corporation's records) as follows: Fiscal year ended November 30, 1959 - $6,806.05 Fiscal year ended November 30, 1960 - $13,170.65 No "X" slips were discovered for the period December 1, 1960 to February 28, 1961. Apparently while the first audit *42 was still in progress, Guerrini brought a criminal information on embezzlement against Ulsh. The information was prosecuted by Brugler, Guerrini's attorney, in accordance with local practice and was scheduled for a preliminary hearing before a local Justice of the Peace. Ordinarily such hearings are held at a time mutually convenient to counsel and the parties. However, the Justice of the Peace fixed the date for the hearing without consulting both sides, and, contrary to local custom, refused to grant a continuance requested by Brugler by reason of a prior commitment. When neither Brugler nor anyone else representing Guerrini appeared at the hearing, the Justice of the Peace dismissed the information. Criminal proceedings against Ulsh were never re-instituted. Subsequent to the dismissal of the criminal information, Ulsh filed a civil action against Guerrini for libel and defamation. During the course of pre-trial proceedings in that case, Guerrini's counsel concluded from the attitude of the judge that as a result of Guerrini's involvement in illegal gambling a civil suit against Ulsh would not be successful, and neither Guerrini nor the Corporation ever brought a civil action against *43 Ulsh or his estate to recover the allegedly embezzled funds. The record does not reveal the outcome of Ulsh's suit against Guerrini. The precise amount of Ulsh's salary from the Corporation was not revealed at the trial herein, although there were some suggestions that it might have been $60 a week or $100 a week, and it does appear that he occasionally received a bonus. During the years in issue Ulsh was married to Helen A. Ulsh. They had a number of children and lived in a comfortable, ranch-style house on a corner lot in Burnham, Pennsylvania. Ulsh owned three automobiles, a Mercury, a 1956 Chevrolet, and a jeep, and had a two-car garage in which to keep two of them. Ulsh was reputed to be well-dressed and generous toward others. Occasionally he gave away small gifts, such as cigarettes, silver dollars, and other items in the $5 to $10 range. Ulsh and his wife had at least three joint savings accounts. Between September 19, 1960, and March 9, 1961, deposits totalling $900 were made in their account at the Mifflin County Savings and Loan Association as follows: Date of Deposit
Deposit
September 19, 1960
$300
October 13, 1960
100
November 10, 1960
100
December 8, 1960
100
January 3, 1961
100
February 6, 1961
100
March 9, 1961
100
*44 No withdrawals were made during that period. On August 18, 1960, their account at the Lewistown Standard Loans and Savings Association showed a balance of $300 as the result of a deposit made on that date. On March 9, 1961, the balance was $904.96. No withdrawals were made during the intervening seven months. A third joint savings account, at the Russell National Bank of Lewistown, had a balance of $3,599.20 on September 19, 1960, and a balance of $4,025.05 on October 11, 1964. One withdrawal of $500 was made between those dates. In addition, the account of G. Bradey Ulsh or wife, Helen A. Ulsh, in the Russell National Bank of Lewistown, Pennsylvania, showed deposits beginning July 14, 1958 and ending November 21, 1961 amounting to $21,991.33. Furthermore, between December 1959 and June 1961, Ulsh purchased United States Series "E" bonds at a total cost of $5,043.75. Also, on August 7, 1959 Ulsh began to purchase mutual funds. By November 29, 1961 he had spent $3,700 on such purchases. On their joint Federal income tax returns for the calendar years 1959, 1960 and 1961, Frank and Marie Guerrini reported their salaries from the Corporation as follows: 1959:
Frank Guerrini
$25,600
Marie Guerrini 400
Total
$26,000
1960:
Frank Guerrini
21,300
Marie Guerrini 5,200
Total
$26,500
1961:
Frank Guerrini
21,100
Marie Guerrini 300
Total
$21,400
*45 1376 Their other reported sources of income during this period were relatively small. They reported $1,705.57, $3,859.72 and $4,240.89 as outside income in 1959, 1960 and 1961 respectively. The primary sources for the income were a partnership interest in Snyder T. V. Sales & Service, Yeagertown, Pennsylvania, dividends from several jointly held investments, interest from four bank accounts, and rent from a number of real estate investments. The Corporation declared no dividends during the years here in issue. Frank and Marie had one son and one daughter. Frank also had two sons by a previous marriage. He educated both of the older boys; one attended Carnegie Institute of Technology and the other attended St. Francis College and Penn State University. On their tax returns for each of the years in issue, Frank and Marie claimed the two younger children as dependents. In addition they claimed one of Frank's older sons as a dependent in 1959 and Frank's mother and father as dependents in 1959 and 1960, asserting that they had furnished 90 percent of their support. Frank and Marie lived in a home which they had built in 1957 or 1958 at a cost of $38,000. The Guerrinis also had several *46 bank accounts during the years in issue: at the First National Bank of Lewistown in the amount of at least $2,000, at the Lewistown Standard Loans and Savings Association in the amount of approximately $3,000, and at the Russell National Bank in the amount of $7,000. The Guerrinis purchased a number of bonds during 1959 and 1960. However, the record does not reveal either the face amount or the purchase price of the bonds. The Guerrinis also held investments in depreciable property with a basis of over $90,000. On several occasions in 1960 Guerrini made personal loans to George W. Baughman and Glenn H. Adams to finance their used car business. The loans were made in the following manner: When Baughman and Adams purchased a group of used cars, they would inform Guerrini of the purchase price. Guerrini would then borrow that amount from the First National Bank of Lewistown and finance the cars until they were sold. Later in 1960 Guerrini determined that the used car business was not as successful as it should have been. He also suspected that the prices Baughman and Adams paid for the used cars were lower than the prices they had quoted to him. In October, 1960, Guerrini had a judgment *47 of $10,200 aaginst Baughman, Adams, and Baughman's wife, Rachel C. Baughman, recorded in the Court of Common Pleas of Mifflin County, Pennsylvania. The debt was subsequently reduced in 1960, in part by the proceeds from the sale of the remaining inventory of used cars and the net proceeds from the sale of the Baughmans' house. Also, at some undisclosed time the debtors agreed informally to pay Guerrini $50 a week on the debt. He received only three such $50 payments; the record does not satisfactorily establish when such payments were made. In late 1960 Guerrini was advised by his attorney, Robert Brugler, that further efforts to collect the remaining debt would be futile. It is unclear whether the debtors' agreement to pay $50 a week or the three $50 payments were made prior to the time when Brugler offered his advice, or even whether these events occurred prior to the end of 1960. In any event, until the trial herein Brugler was not aware of either the agreement or the three payments. On September 16, 1965, a judgment of $3,737.24 against the Baughmans, Adams, and Maxine H. Adams, Adams' new wife, in respect of the foregoing debt was recorded in the Mifflin County Court of Common *48 Pleas. In its Federal corporate income tax returns for the fiscal years ending November 30, 1959, 1960 and 1961, the Corporation reported its gross receipts as $400,618.66, $411,518.72, and $303,325.34, respectively. In each of these years it reported its net taxable income as $56,738.08, $28,237.94 and $22,930.97, respectively. In none of these years did the Corporation include in gross income either the collections reported on the "X" slips or the amounts which were reported on the collection slips but which were not properly added or entered on the Daily Analysis Sheets. In determining deficiencies for the years in question, the Commissioner determined that the Corporation had "unreported income" during 1959, 1960 and 1961 as follows: Taxable year ended Nov. 30, 1959
$42,985.39
Taxable year ended Nov. 30, 1960
62,191.32
Taxable year ended Nov. 30, 1969
4,872.10
Neither the Corporation's income tax returns nor those of the individual petitioners herein reported any dividend distributions by the Corporation during the years here in issue. However, in determining deficiencies with respect to the individual 1377 petitioners herein, the Commissioner determined that during the calendar qears *49 1959, 1960 and 1961, Frank and Marie Guerrini received dividend income from the Corporation as follows: Taxable year ended Dec. 31, 1969
$49,920.31
Taxable year ended Dec. 31, 1960
61,608.79
Taxable year ended Dec. 31, 1961
4,872.10 In addition, the Commissioner disallowed a bad debt deduction of $3,737.24 made by Frank and Marie Guerrini from their taxable income for the calendar year 1960. The Guerrinis' joint Federal income tax return for 1959 was filed sometime after April 12, 1960. On August 30, 1965, Frank and Marie executed a consent form pursuant to section 6501(c)(4), I.R.C. 1954, extending the period for the assessment of tax due on their 1959 return to December 31, 1966. The form also provided that This Consent shall be effective only if, on the date of execution hereof by the taxpayers, the period within which taxes may be assessed has not yet expired. Subsequently the Guerrinis executed three substantially identical forms: On September 21, 1966, they executed a form extending the period for assessment to June 30, 1967; on or about April 4, 1967, they executed a form extending the period for assessment to December 31, 1967; and on October 9, 1967, they executed a form extending *50 the period for assessment to June 30, 1968. The Commissioner's notice of deficiency with respect to the calendar year 1959 was dated and mailed on November 17, 1967. Opinion RAUM, Judge: 1. Unreported corporate income and embezzlement loss. The Corporation concedes that the amounts appearing on the "X" slips for its fiscal years ending November 30, 1959 and 1960 were includable in its taxable income for those years. And although it originally contended that the remainder of what the Commissioner has determined to be "unreported income" was not similarly includable by reason of Ulsh's alleged embezzlements, it now concedes that these amounts were also includable in its income for the respective years; but it takes the position that Ulsh's embezzlements were discovered during fiscal 1961 and that the aggregate amount thereof (which it now claims on brief to be $90,045.15) [2] *51 is deductible as a theft loss for that year. The Government denies that the existence of any such embezzlements has been established, and it challenges the position that the shortages in question were due to any embezzlement by Ulsh. Rather, it suggests that the funds in question were simply taken by Guerrini. Although the matter is not free from doubt and rests entirely on circumstantial evidence, we find that the evidence tips the scales in favor of petitioners. We need not recount the details. It is sufficient to state that we have considered the entire record and have concluded, although without strong confidence, that the shortages appearing on the Daily Analysis Sheets (apart from the shortages due to the "X" slips) were attributable to embezzlements by Ulsh, and that since such shortages were discovered during the Corporation's fiscal year ended November 30, 1961, the aggregate amount thereof is deductible in that year as a theft loss. Section 165(e), I.R.C. 1954. 2. Dividend income to the Guerrinis. In his deficiency notice the Commissioner attributed to the Guerrinis unreported dividend income from the Corporation for the calendar years 1959-1961 *52 in the respective amounts of $49,920.31, $61,608.79 and $4,872.10. These amounts were obviously intended to represent the amounts of unreported corporate income which the Commissioner assumed had been withdrawn by Frank Guerrini. [3]
To the extent that we have sustained petitioners' contentions, supra, that the unreported corporate income was based upon Ulsh's embezzlements we must conclude that there were no withdrawals by Guerrini that would support dividend treatment. However, the amounts attributable to the "X" slips present a different problem. The record discloses unreported corporate income in the amounts of $6,806.05 and $13,170.65 allocable to the "X" slips for the fiscal years ending November 30, 1378 1959 and 1960. These amounts came into Guerrini's hands. He argues, however, that *53 he used them entirely for corporate purposes, and that they therefore did not represent dividend income to him. The alleged corporate purposes were (a) the purchase of slot machines and (b) periodic payments to Patrick Guerrini and Norman Oldt for promotional purposes on behalf of the Corporation. The evidence in respect to these matters was very unsatisfactory, although we did make findings that Frank did make some such expenditures on behalf of the Corporation. We do not believe that all the proceeds of the "X" slips were thus expended. The situation calls for application of the so-called Cohan rule (39 F. 2d 540, 544 (C.A. 2)), and doing the best we can with the materials at hand we hereby find that during the fiscal years 1959 and 1960 Frank expended $2,000 and $3,500 on behalf of the Corporation in purchasing slot machines for it. Similarly we find that he paid a total of $2,000 to Patrick Guerrini and Norman Oldt for corporate purposes during the fiscal year ending November 30, 1959.[4] *54 Accordingly, we find that the amounts of the "X" slips in excess of the foregoing corporate expenditures were retained by Frank and represent unreported taxable income in his hands. [5]
3. Statute of limitations with respect to the Guerrinis' 1959 taxes. Although the deficiency notice herein was mailed to the Guerrinis within the period allowed under an extended waiver, the original waiver was executed more than three years but less than six years after they had filed their 1959 return. Accordingly, the notice was untimely unless as contended by the Government, the return omitted gross income in excess of 25 percent of the amount of gross income reported. Section 6501(e)(1), I.R.C. 1954. The burden of proof in this respect rests upon the Government. Genevieve B. Walker, 46 T.C. 630, acq. 1967-1 C.B. 3; Elizabeth H. Bardwell 38 T.C. 84, affirmed 318 F. 2d 786 (C.A. 10). The record shows that the Guerrinis' 1959 return reported adjusted gross income in the amount of $27,705.57. And although we have found above that Frank Guerrini was chargeable with unreported *55 income in connection with the "X" slips, it is obvious that the amount involved for 1959 is less than 25 percent of the gross income reported by the Guerrinis. We therefore hold that the notice of deficiency was untimely as to them with respect to their 1959 taxes. 4. Corporate deduction for alleged promotion payments in 1959 to Patrick Guerrini and Norman Oldt. In its petition to this Court, the Corporation claimed a deduction in the amount of $7,600 in respect of this item. On brief it recognizes the applicability of the Cohan rule here and urges a deduction of $5,000. We found above that only $2,000 was expended for such promotional purposes. To the extent that Frank may have given these persons anything more it did not represent any ligitimate corporate purpose. These payments are to be sharply contrasted with their wages which were paid by check and presumably recorded on the books of the Corporation. It must be remembered that Patrick Guerrini was Frank's brother and that Norman Oldt was married to Frank's sister. Such excess payments were more in the nature of gifts to close relatives than deductible business expenses. We hold that the Corporation is entitled to a deduction *56 of not to exceed $2,000 in respect of this item. 5. Bad debt loss. The final issue presented is whether the Guerrinis realized a bad debt loss in 1960 because Frank Guerrini's loans to Baughman and Adams became worthless during that year. We hold that the evidence presented by the petitioners fails to support their contention that the loans to Baughman and Adams became worthless in 1960. The burden of proof was on the petitioners. They did not introduce at the trial herein the agreement alleged to be the basis for the debt. The only evidence of the worthlessness of the debt is the unconvincing testimony of Frank Guerrini's attorney, Robert Brugler, that as of the end of 1960 further efforts to collect on the debt would have been futile. Brugler's testimony was largely conclusory in nature and based on a superficial evaluation of the prospects for collection. Furthermore, without additional evidence and in view of the fact that Brugler was unaware of both the 1379 debtors' informal agreement to pay Guerrini $50 a week and the three payments made pursuant thereto, [6] Brugler's testimony is inadequate to carry the petitioners' burden of proof. We sustain the Commissioner's disallowance *57 of the bad debt loss deduction. Decisions will be entered under Rule 50. Footnotes
1. He also determined certain additions to tax for fraud pursuant to sec. 6653(b), I.R.C. 1954↩, in respect of each of the tax years against the taxpayers in both dockets. However, he has since conceded the issues pertaining to such additions and they are no longer in controversy.
2. There appear to be certain minor discrepancies in amount in respect of the Commissioner's determination and the figures appearing in the record. The parties have indicated, however, that no dispute exists between them in this connection, and the Court assumes that the matter will be agreed upon by them in the decision to be entered under Rule 50.
3. These amounts are not precisely equal to the figures of unreported corporate income, and the differences may be due either entirely or in major part to the fact that the Corporation was on a fiscal year basis whereas the Guerrinis reported their income on a calendar year basis. The computations whereby the fiscal year figures were converted into calendar year figures do not appear in the record.↩
4. No issue seems to be raised as to payments to these persons during the following fiscal year. 5. Our conclusion is framed in terms of the Corporation's fiscal years and we leave it to the parties to make an appropriate allocation to the Guerrinis' calendar years in connection with the decision to be entered under Rule 50.↩
6. We note also that paragraph 5(f) of the Guerrinis' petition to this Court alleges an uncollectible balance of $3,875.27 as of the end of 1960, whereas the deduction claimed is $3,737.24, thus suggesting that there may have been some repayment between December 31, 1960 and the date of filing the return in 1961.↩